**Nicholas M. BLASSIE and Otto Etzel, Appellants,**

v.

**The KROGER COMPANY, The Great Atlantic & Pacific Tea Company, Inc., and National Food Stores, Inc., Appellees.**
**Harry R. POOLE and Frank X. Davis, Appellants,**

v.

**The KROGER COMPANY, The Great Atlantic & Pacific Tea Company, Inc., and National Food Stores, Inc., Appellees.**

**Nos. 17598, 17622.**

United States Court of Appeals Eighth Circuit.

April 23, 1965.

---

Harry H. Craig of Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., made argument for appellants Nicholas M. Blassie and Otto Etzel and filed brief.

Bernard Dunau, Washington, D. C., made argument for appellants Harry R. Poole and Frank X. Davis and filed brief with Lester Asher, Chicago, Ill., and Morris J. Levin, St. Louis, Mo.

J. Terrell Vaughan of Armstrong, Teasdale, Roos, Kramer & Vaughan, St. Louis, Mo., made argument for appellees and filed brief with Walter M. Clark and Torrey N. Foster of Armstrong, Teasdale, Roos, Kramer & Vaughan, St. Louis, Mo.

Samuel J. Cohen of Cohen & Weiss, New York City, made argument for amici curiae Milk Industry Drivers—Dairy Employees Unions Pension and Welfare Fund and others and filed brief with Weil, Gotshal & Manges, Cooper, Ostrin, DeVarco & Ackerman, New York City, Parsonnet & Parsonnet, Newark, N. J., Cohn & Glickstein and Zelby & Burstein, New York City.

Stanley M. Rosenblum of Rosenblum & Goldenhersh, St. Louis, Mo., made argument for amicus curiae Teamsters' Local 688 Ins. & Welfare Fund and filed brief with Merle L. Silverstein of Rosenblum & Goldenhersh, St. Louis, Mo.

Charles P. Scully, and Johnson & Stanton, San Francisco, Cal., filed brief for amicus curiae Carpenter Funds Administrative Office of Northern California in support of appellants, without oral argument.

Before MATTHES, BLACKMUN and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

The plaintiffs, The Kroger Co., The Great Atlantic & Pacific Tea Co., Inc., and National Food Stores, Inc., are three retail chain employers which have stores in the Saint Louis area and which, with many other employers, make contributions on behalf of employees to the "Local 88 Meat & Related Industries Welfare Fund Trust".

By this action, begun in January 1962 against the five then trustees (two union, two employer and one public) of the Trust, the three plaintiffs seek to enjoin alleged violations of § 302 of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. § 186. Section 302 (e) provides jurisdiction. The union is Meat Cutters Local No. 88. Its international affiliate is Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO.

The plaintiffs were generally successful at the trial, for the district court, after filing its memorandum opinion, Kroger Co. v. Blassie, 225 F.Supp. 300 (E.D.Mo.1964), entered a judgment and decree on January 24, 1964, by which it

1. Permanently enjoined the trustees and their successors, and Nicholas M. Blassie, Otto Etzel, and James Mathews, former union trustees and alternate union trustee, respectively, from expending or using trust assets for the benefit [1] of (a) any person who has retired as an employee of any contributing employer of the Trust; (b) retired persons who have never been in the employ of contributing employers; (c) any officer or employee of the union; or (d) any employee of the Trust;

2. Directed the trustees and their successors, and Blassie, Etzel and Mathews, to sell certain Jefferson County, Missouri, land, and the improvements thereon, within a reasonable time but, nevertheless, forthwith to take all steps necessary to effect the sale for the best price obtainable;

3. Enjoined the trustees and their successors from expending any funds for the further development of the Jefferson County area except for necessary maintenance pending the sale;

4. Permanently enjoined the trustees and their successors, and Blassie, Etzel and Mathews, from expending or using trust assets "for any type of recreational facility or program instituted wholly for recreational purposes";

5. Permanently enjoined the trustees and their successors, and Blassie, Etzel and Mathews, from expending or using trust assets for the operation of a pharmacy or other dispensary on specified property in Saint Louis or elsewhere, except that the pharmacy may be operated "so long as its services and facilities are available exclusively to employees of contributing employers who are lawful beneficiaries of the" Trust; and

6. Directed the trustees and their successors, and Blassie, Etzel and Mathews, to remove, within a reasonable time, all offices of the Trust from the Saint Louis building owned by the union's Benevolent Society, and "to secure quarters in a location completely removed from any union activities".

Former union trustees Blassie and Etzel have taken a general appeal. Present employee trustees Harry R. Poole and Frank X. Davis appeal from that portion of the court's judgment and decree which granted the relief we have described above in paragraphs 1(a), (c) and (d). Defendants Edward J. Schnuck, Albert Wagenfuehr, and the Right Reverend Monsignor John W. Miller, who are also present trustees, and Mathews, have not appealed. The plaintiffs have effected no cross appeal.

The issues here, in general terms, are: (a) whether retired persons may be beneficiaries of the Trust; (b) whether employees of the Trust may be beneficiaries; (c) whether employees of the union may be beneficiaries; (d) whether officers of the union may be beneficiaries; (e) the

1. "Benefit", as used herein, has application to the individual's family and dependents as well as to himself.

propriety of the court's order directing the sale of the Jefferson County land and improvements; (f) the availability of the pharmacy to persons other than beneficiaries of the Trust; and (g) the propriety of the court's order directing the removal of the Trust's offices. These seven issues all obviously have to do with the propriety, under § 302(c) and the trust agreement, of trust expenditures and activities. An eighth issue, a preliminary one suggested by this court prior to oral argument, is that of the status of Blassie and Etzel, as only former and not present trustees, to appeal.

We are favored with briefs from several amici curiae. Teamsters' Local 688 Insurance & Welfare Fund, Saint Louis, has filed a brief directed to aspects of the Jefferson County land issue. Eleven trust funds located in the East (the eastern amici) have filed a brief directed to the issues concerning retirees, union officers and employees, trust employees, and location of trust offices. Carpenter Funds Administrative Office of Northern California, Inc., has filed a brief directed to the issues concerning retirees, employees and officers of the union, and trust employees.

*The Formal Provisions of the Trust Agreement.* The original agreement was executed on January 29, 1953. It provided that a participant was "any employee whose employer has agreed to provide and pay for the group insurance benefits made available". The trustees were given authority to employ administrative personnel, to procure group insurance, and to adopt rules consistent with the agreement. The trustees were five in number, two appointed by the union, two by the employers, and the fifth, who was chairman and executive director of the program, "by mutual agreement" of the other trustees. The union had the right to remove the trustees it appointed and the employers had the right to remove theirs. The trustees, in their discretion, were to secure, for the covered employees, group policies for life insurance, accident and sickness, hospital, medical and surgical expense, and the like. No participant or employer was to have any vested interest in the fund, in payments therefrom, or in eligibility rquirements.

The agreement was thereafter amended a number of times. On September 21, 1954, it was completely rewritten to provide, among other things, that the beneficiaries were persons "who are, who have been, or who shall be members of" the union "and who are, who have been, or who shall be employed either by that union, or by the employers", both wholesale and retail, "who shall have entered into collective bargaining agreements with the union" providing for payments to the Trust. On May 24, 1956, the trustees were authorized to erect and operate "a non-profit health center or hospital" to provide medical and hospital services for beneficiaries, and to acquire property and personnel therefor.

On December 20, 1956, the agreement was again completely rewritten. This stated that the purpose of the Trust, among other things, was to pay for "medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity, or insurance. * * *" An amendment of March 28, 1957, provided that the term "employees" was also to include union members "(and dependent wives only) who were insured under this agreement, but who have retired and whose annual earnings do not exceed $1200.00 per year". An amendment of September 19, 1957, broadened the stated powers of the trustees to include operation of a camp and, in the program of medical care, "a competently-staffed convalescent home and center, an occupational therapy workshop", dormitories and cottages "where group therapy may be applied in camp surroundings", and the like. A further amendment of the same date provided for three "Alternate Union Trustees" in order to "insure a continuity of Union representation at trust meetings". An amendment of August 21, 1958, deleted the reference to union member-former insureds who have retired. An amendment of November

20, 1958, gave the trustees general powers to borrow and to mortgage.

The agreement was completely rewritten once more on December 18, 1958. This time it provided that the union and the Trust could contribute as employers thereunder. On October 15, 1959, the reference, among the trust purposes, to "pensions on retirement or death of employees" was deleted. Finally, on May 27, 1963, amendments were adopted substituting the phrase "employee trustees" for "union trustees", giving the employees the right to remove and replace employee trustees, and eliminating the provision for alternate union trustees.

This chronology of the formal agreement, its amendments, and the successive complete revisions reveals the following:

1. At the inception of the Trust in January 1953 its scope and application were limited. It was restricted, first, to employees of meat wholesalers. It perhaps was restricted, next, as to beneficiaries, in that participants were only persons who were actually working. And it was further restricted as to benefits: the ones contemplated were only those provided by group insurance for life, accident and sickness, hospital, medical and surgical expense, and the like.

2. The amendments and complete revisions, however, sought to broaden these limits. The employer concept was widened to include meat retailers and the union and the Trust itself. Inclusion of certain union member-retired employees appeared and then disappeared. And the benefit provisions and trust powers were greatly expanded to allow acquisition of protection other than group insurance; the erection and maintenance of a health center, hospital, camp, and the like; the furnishing of health, hospital, and related services, even including programs of dormitory and cottage life for group therapy; and the hypothecation of trust property.

3. A reference to pensions first appeared in the complete revision of 1956 but was deleted by the 1959 amendment. Apparently this was a belated move to bring the agreement into line with § 302(c) (5) (C) and its requirement that payments intended for pensions or annuities are to be made to a separate trust solely for that purpose.

In addition, and apart from the formal provisions of the trust agreement, as amended and revised, the trustees, or some of them, sometimes by purported rule or regulation, and sometimes with less formality, have acted in other ways to broaden the impact of the Trust in practice and application.

*The Statute.* Section 302, being a part of the Labor Management Relations Act, came into being in 1947. It was amended, after this Trust was already in existence, by § 505 of the Labor-Management Reporting and Disclosure Act of 1959, Pub.L. 86–257, 73 Stat. 537. The latter Act's amendments, although applicable to the Trust, do not affect the present issues.

The statute, by § 302(a), makes it unlawful for an employer to make any payment to any "representative" of any of its employees who are employed in an industry affecting commerce, or to any labor organization, or officer or employee thereof, which represents any of the employees. Correspondingly, by § 302(b), the demand for or receipt of any such payment is also made unlawful.

Section 302(c), however, provides exceptions to this declaration of unlawfulness. These are (1) compensation for an employee's service; (2) the payment of a judgment or proper award; (3) a purchase at the prevailing market price in the regular course of business; (4) check-off of union dues; (5) certain payments to a welfare trust fund; and (6), as added in 1959, payments to a trust fund "for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs", provided that the trust has the same protective provisions specified by § 302(c) (5) (B).

The fifth exception [2] is the one which is vital here. It relates to payments made to a trust established "for the sole and exclusive benefit of the employees * * * and their families and dependents (or of such * * * jointly with the employees of other employers making similar payments, and their families and dependents)". But it contains provisos that (A) the payments are held for the purpose of paying "for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees" or other stated benefits; (B) the basis on which the payments are to be made is specified in a written agreement with the employer; the employees and employers are equally represented in the administration of the trust together with such neutral persons as may be agreed upon; and provisions are present for an annual audit the results of which shall be available for inspection by interested persons; and (C) payments intended for pensions or annuities for employees "are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities".

By § 302(d) a willful violation of the section is a misdemeanor.

*General Facts.* 1. The plaintiffs' Saint Louis area stores have separate meat departments. Employees in those departments are members of the union. For some years a collective bargaining relationship has existed between the union and meat industry employers. This resulted in a series of labor agreements and the establishment of the Trust in January 1953. After the Trust was expanded to include employees of retailers the plaintiffs by contract became contributing employers.

2. Defendant Blassie was one of the original union trustees. He was also an officer and business agent of the union. Defendant Etzel was the other union trustee and was so designated in 1957. He too, was an officer of the union. Defendant Mathews was president of the union when the suit was instituted and an alternate union trustee. Defendant Schnuck is an employer trustee. Defendant Wagenfuehr is the other employer trustee but was not accepted as such by Blassie and Etzel; his status was finally recognized shortly before trial. Defendant Miller is the public trustee.

3. The president of the International on May 13, 1963, while the suit was pending, removed Blassie and Etzel as trustees and replaced them with Poole and

2. Section 302(c).

"The provisions of this section shall not be applicable * * * (5) with respect to money or other thing of value paid to a trust fund established by such representative for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon * * * and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities * * *."

Davis. Although the trial took place after this removal and substitution, Poole and Davis were not joined as parties defendant and did not formally come into the case until they were permitted to intervene, pursuant to Rule 24, F.R.Civ. P., after trial and immediately prior to judgment. Blassie and Etzel actively participated in the trial.

4. Despite the deletion on August 21, 1958, of the trust agreement's reference to certain retired persons, some retirees have participated as beneficiaries since June 1957. Contributions for their coverage have been made by the retirees themselves in amounts specified by the trustees from time to time; these amounts have been less than that paid by a contributing employer for a covered employee. Union membership, in practice, is required. In theory, specified coverage prior to retirement was also required but as of May 31, 1963, eight participating retirees were persons who had not been so covered.

5. From the inception of the Trust, officers of the union have been included as beneficiaries although not employed by any contributing employer. Contributions on their behalf were made to the Trust by the union. In December 1957, by purported regulation, the union and the Trust were accorded the privilege of contributing so that their respective employees could have the benefits of the trust program. All this was formalized in the complete revision of December 18, 1958. Both the union and the Trust accepted this proffered status. The union made the necessary payments to the Trust on behalf of its employees. The Trust effected payment for its employees by appropriate book transfers from surplus. The beneficiaries thus additionally covered were only those who were members of the union.

6. At the time of the trial a contributing employer paid $31.70 per month for each covered employee who averaged 23 or more hours of work per week for the month. The three plaintiffs were contributing more than $200,000 annual-

ly. This figure was more than one-fourth of the total contributions to the Trust.

7. The Trust has three primary fields of operation: the group insurance program, the Medical Institute, and the Jefferson County land.

(a) The insurance program is supervised by a salaried administrator. His office receives the contributions from participating employers and pays the premiums for group and other insurance carried by the Trust.

(b) The Trust in 1958 completed the construction of a building in Saint Louis for its Medical Institute. The Institute has a medical staff and administrative personnel.

(c) The Jefferson County land. This consists of approximately 586 acres acquired in late 1958. Although described as a "Retreat for Convalescing and Geriatrics Treatment", and although there was some evidence presented that the property was regarded as part of a long term program to provide medical and health benefits, and was not intended to be limited to recreation, the trial court found that it was acquired for recreational purposes and that up to the time of trial had not been used for any other purpose.

8. Pension benefits have never been provided by the Trust.

*Matters not in issue on the appeal.* Because the plaintiffs have effected no cross-appeal, some items in the complaint and in the prayer for relief are not at issue here. We refer to them only so that we may be sure to set to one side these presently nonsignificant but originally controversial aspects of the case. Among these are the plaintiffs' suggestions as to inequality in representation among the trustees and as to differences in the methods of removing union trustees and employer trustees. The May 27, 1963, amendment may have resolved both these problems. Another, and the warmest issue, was misconduct of the union trustees, particularly Blassie. The range of the allegations and proof as to this is

largely evident from the trial court's opinion and from the court's characterization of Blassie's activity on p. 306 of 225 F.Supp. This provides a colorful and unsavory background for the case but we need not repeat it here. The trial court went on to hold that control of day-to-day administration of the Trust is a matter for the state courts and that jurisdiction is granted to federal courts to enjoin violations rather than to provide a remedy for abuses already perpetrated.

We note in passing that it has been said that a trust of this kind (or at least the union trustees thereof) qualifies as a "representative" of the employees under § 302(a) and is thus within the basic prohibition of the statute. Local No. 2 of Operative Plasterers, etc. v. Paramount Plastering, Inc., 310 F.2d 179, 182, 185–86 (9 Cir. 1962), cert. denied 372 U.S. 944, 83 S.Ct. 935, 9 L.Ed.2d 969; Mechanical Contractors Ass'n of Philadelphia, Inc. v. Local Union 420, 265 F.2d 607, 611 (3 Cir. 1959).

*The Statute's Purposes.* These have been clearly recognized by the Supreme Court in Arroyo v. United States, 359 U.S. 419, 425–426, 79 S.Ct. 864, 868–869, 3 L.Ed.2d 915 (1959):

"The provision [§ 302] was enacted as part of a comprehensive revision of federal labor policy in the light of experience acquired during the years following passage of the Wagner Act * * *, and was aimed at practices which Congress considered inimical to the integrity of the collective bargaining process. * * * Those members of Congress who supported the amendment were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control. * * *

"Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain. * * * To remove these dangers, specific standards were established to assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established." [footnotes omitted]

See also United States v. Roth, 333 F.2d 450, 453 (2 Cir. 1964), petition for certiorari denied, 380 U.S. 942, 85 S.Ct. 1020; Sanders v. Birthright, 172 F.Supp. 895, 901 (S.D.Ind.1959); United States v. Brennan, 134 F.Supp. 42, 47 (D.Minn. 1955).

■ *Status to Appeal.* We were initially concerned as to whether Blassie's and Etzel's removal and replacement deprived them of status to appeal. The Poole and Davis motion to intervene also suggested their lack of an appealable interest. The point has some importance because Blassie and Etzel raise issues here in addition to those presented by Poole and Davis.

It has been said generally that a fiduciary, after his removal or resignation, does not have sufficient official interest to authorize him to seek appellate review of an adverse judgment; that the successor in interest may be substituted; and that one who possesses an appealable interest at the inception of a lawsuit, but then loses it by termination of his authority before judgment, cannot appeal. 4 Am.Jur.2d Appeal & Error, §§ 209, 287, and 179; 4 C.J.S. Appeal & Error §§ 404–405.

Here, however, the posture of both Blassie and Etzel in the trial litigation and on this appeal is more than that of union trustees. The entire atmosphere of the lawsuit envelops these two men individually as well as fiduciarily. The court's judgment and decree refers to Blassie and Etzel by name and enjoins and restrains them by name and as individuals or directs them by name and as

individuals to perform positive acts. Their violation of these commands would subject them to contempt. Costs were taxed against all defendants. In the light of the evidence and the record the court's inclusion of the two, individually, as objects of the judgment and decree was not improper and was within the powers vested in the court under § 302 (e) and Rule 65(d), F.R.Civ.P. They were persons "interested" in the judgment within the meaning of Rule 74, F.R. Civ.P. The trial court did not disconnect them from the case by mere substitution of Poole and Davis; the latter, instead, were permitted to intervene as additional defendants.

We are persuaded, therefore, that Blassie and Etzel do have an appealable interest under long accepted definitions of that concept. See Arledge v. Chilton County, 237 Ala. 96, 185 So. 419, 421 (1938); In re Michigan-Ohio Bldg. Corp., 117 F.2d 191, 193 (7 Cir. 1941); Fuqua v. Bidwell, 281 F.2d 753, 754 (6 Cir. 1960); Mayer v. National Missile & Electronics, Inc., 326 F.2d 401, 402 (9 Cir. 1964).

■ *Our general approach.* We recognize that the Supreme Court, in Arroyo v. United States, supra, at p. 424 of 359 U.S., 79 S.Ct. 864, said, as to § 302, "We construe a criminal statute". See also United States v. Ryan, 350 U.S. 299, 305, 76 S.Ct. 400, 100 L.Ed. 335 (1956). We are aware, too, that in Arroyo a bare majority went on to say that "a literal construction of this statute does no violence to common sense", that the majority gave the statute a narrow application to the facts there presented, and that the minority stated, p. 433 of 359 U.S., 79 S.Ct. p. 872, "Section 302(b) is in all practical effect repealed". Arroyo, however was an appeal from the affirmance of a judgment of conviction in a criminal case.

We are concerned here, instead, with requested civil relief under § 302(e). We do not believe that in this posture the Supreme Court majority in Arroyo would rigidly pursue the strict construction which a criminal statute customarily receives. We would prefer to approach our present task with a construction policy favoring inclusion and benefits where there is no positive statutory language or inference of exclusion, rather than one favoring exclusion and a denial of benefits where there is no positive language of inclusion.

■ *Retired persons as beneficiaries.* This issue breaks down into two parts: Does the statute restrict current enjoyment of benefits of a § 302(c) (5) trust to persons in active employment? If not, does the trust agreement itself impose that restriction? The first is a question of legality. The second is one of contract.

1. The statute. We conclude that, so far as the statute as it now reads is concerned, a person for whom employer contributions are made prior to retirement is not barred from receiving benefits of the Trust after retirement, and that this qualification is not nullified by additional contributions made by him or by others on his behalf. We also conclude, however, that a person for whom employer contributions are not made prior to retirement is not entitled under the statute to benefits of the Trust after retirement, and that this disqualification is not cured by contributions made by him or by others on his behalf.

We are led to these conclusions by the following factors:

a. Section 302(c) (5) requires that there be a payment to the Trust by an employer. Although the very first words of clause (5) are not in themselves so confined, the requirement is evident from the immediately succeeding parenthetical material which speaks of "other employers making similar payments", and from the fact that § 302 is a statute concerned with employer payments.

■ b. The section also requires that there be payment effected during an employee's active employment. The payment is to be "for the sole and exclusive benefit of the employees of such employer". An employee ordinarily is a person presently engaged in employment. He is "One employed by another; one who

works for wages or salary in the service of an employer". Webster's New International Dictionary (2d Ed.1960), p. 839. See Koch v. Wix, 108 Ind.App. 20, 26, 25 N.E.2d 277, 279 (1940), and Youngstown Sheet & Tube Co. v. Review Bd., 191 N.E.2d 32, 36 (Ind.App.1963). Note the Supreme Court's approach to the term in NLRB v. Hearst Publications, Inc., 322 U.S. 111, 124, 129, 64 S.Ct. 851, 88 L.Ed. 1170.

c. However, the presence of these two requirements—payment by the employer and current employment—does not mean that benefits which flow from these contributions of the employer (and from any other receipts of the Trust) are to be confined in their enjoyment to the period of the employee's active employment. There is nothing in the statute which clearly prescribes this and we see nothing in its language which could support so restrictive an inference.

d. The statute by its very language obviously contemplates the enjoyment of certain benefits after an employee's retirement or while he is inactive. It speaks of pensions on retirement or death, of compensation for illness resulting from occupational activity, of unemployment benefits, of life insurance, of disability and sickness insurance, and the like. And § 302(c) (6) refers to "severance or similar benefits".

e. Any plan for the health and economic well-being of employees, whether it be one gratuitously granted or one hammered out by hard bargaining, would normally be expected to embrace the crises of unemployment, retirement, and disability, as well as those of the better times of active employment. An opposite result, with benefits available only when the weather is fair and the needs are less, would be ironical in application and, we feel, should not be reached without a clearer indication of congressional intent than we have here. The Supreme Court, in Lewis v. Benedict Coal Corp., 361 U.S. 459, 468, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960), observed, "It is a commonplace of modern industrial relations for employers to provide security for employees and their families to enable them to meet problems arising from unemployment, illness, old age or death". The trend of welfare plans toward the inclusion of retired persons is a fact of today's industrial life which needs no documentation here.

f. The reasons for the statute, and its purposes, so specifically expressed in the quotation above from Arroyo, do not require a different result. Benefits after retirement are not an evil at which the statute was directed.

g. The requirement of § 302(c) (5) (C) that payments intended for pensions or annuities flow into a separate trust administered exclusively for that purpose contains no contrary implication apparent to us. The requirement of separateness, and, for that matter, the requirement of exclusiveness of benefit for employees tie in, not unexpectedly, with those provisions of the Internal Revenue Codes exempting qualified pension and welfare trusts from income taxation. Sections 165(a) and 101(16) of the 1939 Code; §§ 501(a), 401(a) [but see § 401 (h), added in 1962 by Pub.L. 87–863, § 2(a), 76 Stat. 1141], and 501(c) (9) of the 1954 Code; 92 Cong.Rec. 5277, 5338, 5346, 5494 (remarks of Senators Ball and Taft).

h. We see nothing abhorrent to the statute or improper in a trust's receipt of contributions (in addition to those from the employer) from the employee, active or retired, or from another source in his behalf, so long as these are with the knowledge and consent of the trustees. As noted above, there must be employer contributions in the first place. The requirement of § 302(c) (5) (B) that the "basis on which such payments are to be made is specified in a written agreement with the employer" is obviously directed only to the collective bargaining employer's payments and not to such supplemental ones.

i. We may assume, for present purposes, that only funds within the exceptions of § 302(c) are exempt "from the sweep of congressional condemna-

tion". Paramount Plastering, Inc. v. Local No. 2, etc., 195 F.Supp. 287, 293 (S.D.Cal.1961), aff'd 310 F.2d 179, 184 (9 Cir. 1962), cert. denied 372 U.S. 944, 83 S.Ct. 935, 9 L.Ed.2d 969. But we find nothing in this assumption or, in the cases cited by the plaintiffs which compels us to reach a contrary result. Arroyo's reference to "specificity" of benefits payable, p. 426 of 359 U.S., 79 S.Ct. 864, Ryan's characterization of the statute as *malum prohibitum*, p. 305 of 350 U.S., 76 S.Ct. 400, and the statement in Upholsterers' Intern. Union of North America v. Leathercraft Furniture Co., 82 F.Supp. 570, 574 (E.D.Pa.1949), that the fund must be used for employee-members' "sole and exclusive benefit" are not inconsistent with our conclusion. The standards of all these cases are met when benefits are restricted to persons who are or who have been covered active employees. This is the employee group constituting the "sole" beneficiaries.

j. We do not regard our conclusion as at all violative of any call by Arroyo for literal construction of the statute. All we do in this civil proceeding is to construe the term "employees" to mean covered current employees and persons who were covered current employees but are now retired. This is not non-literal construction but one which, we think, comports with the ordinary and literal meaning of the term.

k. The plaintiffs urge that nowhere in the congressional debates is there a single mention of coverage of retired persons and that such mention would have appeared had they been intended beneficiaries. The statute, however, speaks broadly of benefits. It specifies benefits for medical or hospital care, and for injuries or illness, and for disability and sickness, and for accident. Misfortune of this kind is not confined to the active employee. It strikes the retired one as well and, because of his age, with greater frequency. We are not persuaded, therefore, that any failure in the congressional debates specifically to link retired persons to health care is any indication of an intent to deprive them of such bene-

fits. Indeed, the opposite inference— that they are not mentioned because no one conceived them to be excluded—is reasonable.

l. The plaintiffs argue, too, that an active employee is always near at hand and thus his claim for benefits may be investigated quickly and easily, whereas a retired employee often moves away and, being at a distance, his claim is not then so easily investigated and presents an opportunity for abuse. We are not convinced that the premise is well founded; in any event, if there is any strength in this pragmatic approach, we are not impressed by it. We regard distance as a possible fact of life of trust administration. The same could be said of the pension and unemployment benefits clearly authorized by the statute.

m. The 1959 amendment to the statute, as we have observed, added § 302(c) (6), permitting an employer's payments to a trust fund established for "the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs". We think it unlikely that Congress would extend the exemption of the statute to purposes of this kind and yet withhold the exemption from retirement benefits.

n. Some precedent is perhaps afforded by the fact that those provisions in the Internal Revenue Codes which, for income tax exemption, require that a pension or welfare trust be "for the exclusive benefit of [his] employees" have been administratively interpreted to include former employees. Regulations 111, § 29.23 (p)–1, and Regulations 118, § 39.23(p)–1, under the 1939 Code; § 1.401–1(b) (4) of the Regulations under the 1954 Code.

■ 2. The trust agreement. We also conclude that the trust agreement itself does not restrict the benefits of this Trust to persons presently in the active employ of contributing employers.

The instrument's evolution, described above, produced an initial reference to certain retired persons in the amendment of March 28, 1957, and the deletion of this reference on August 21, 1958.

These two steps together leave the agreement, as it was originally, devoid of positive reference, one way or the other, to retirees. It may be argued, of course, that the appearance and disappearance of the formal reference to a limited class of retirees indicates an intent on the part of the parties that retirees are not to be included and, when included, were limited to a small group for a short time.

We do not attach any such significance to the agreement's sixteen month period of reference to certain retirees. Although it is conceded that the agreement, at its inception in January 1953, confined its benefits to then active and covered employees, this was natural for the inception of the Trust. But the definition of possible beneficiaries seems to have been broadened at the very first revision, in September 1954, with its reference to persons "who have been" members of the union and "who have been employed". In the later revisions the general term "employees" was used. As we read the several drafts this term relates to the time of contributions rather than to the time of possible enjoyment of benefits. It must be conceded that the language employed from time to time was not impeccable draftsmanship; if it were, the issue would not be before us. But the wording is certainly not exclusionary. Many of the same considerations which have led us to our conclusion as to the language of the statute apply with equal force as to the language of the agreement. We are not convinced that the parties to the trust agreement were less concerned with retirees than with active employees.

Our conclusion that retired persons may be beneficiaries should not lead to indiscriminate coverage and inclusion. Of course, there is always danger of maladministration. This is true of any trust and of any fiduciary. But the congressionally imposed joint administration of these § 302(c) (5) trusts was one device for minimizing abuse and misjudgment. If, despite this safeguard, there is still maladministration, that is not primarily the fault of the statute but of human frailty. Maladministration and the statutory eligibility of retired employees are separate questions and are not to be entangled.

We therefore conclude that neither the statute nor the trust agreement restricts the benefits of the Trust to persons presently engaged in active covered employment. At the same time we conclude that the statute does not, and the trust agreement therefore cannot, permit the extension of benefits to persons who have never been in the active employ of a contributing employer or to those who, although having been in active employment, were not covered by employer contributions. Specifically, this eliminates the eight retirees who, unjustifiably, have been allowed benefits of this Trust although not covered by the program before their retirement. The district court was right as to their elimination.

■ *Employees of the Trust as beneficiaries.* The statute does not, in so many words, recite that employees of the Trust may be beneficiaries; neither does it expressly disqualify them. The December 1958 revision of the agreement would permit their coverage.

The district court, pp. 308–309 of 225 F.Supp., denied coverage for Trust employees on the ground that if Congress had thought they should be included it could have done so; that § 302(c) (5) requires that the fund be for the sole purpose of employees of contributing employers; that this requirement is not satisfied when the Trust effects payments for its employees by bookkeeping transfers; and that a contrary result would enable dishonest trustees to make payments to persons not qualified.

We reach the opposite conclusion and hold that the statute does not bar participation of genuine employees of the Trust, and that this agreement's coverage of them is not improper. We do so because

■ 1. The Trust concededly has employees. It thus falls within the term "employer" to the extent that term is

defined in §§ 501(3) and 101(2), 29 U.S.C. §§ 142(3) and 152(2).[3] Also, § 302(c) (5) clearly contemplates contributions by more than one employer, for it speaks of "other employers making similar payments". The Trust thus fits the technical structure of this portion of the statute.

2. The expense of having employees in this modern day includes not only their wages but, also, other benefits which may well include a health and welfare fund. When reasonable, these are appropriate administrative expenses of the Trust. Coverage, therefore, effected by an internal book transfer from surplus does not impinge upon other contributing employers' contributions any more than a cash wage does and does not make the Trust any less a contributor.

3. It strikes us as not unnatural that the Trust's employees have available the same protective coverage as those persons whom, through the Trust, they serve. It also strikes us as good business if this can be obtained for the Trust at advantageous rates available for the larger group, rather than at more expensive rates which coverage for a comparative few usually entails.

4. We see no particularized danger of abuse. Payments are made to a jointly administered fund. There is present only the same possibility of abuse which is at hand when any trustee or group of trustees chooses to be dishonest.

5. We find nothing of substance in the suggestion that employees of the Trust cannot be beneficiaries because there is no written agreement, applicable to them, of the kind required by § 302(c) (5) (B). This requirement, when viewed in the light of the statute's purpose, impresses us, as we have intimated above, as having application only to those employers subject to collective bargaining procedure with the union. It does not fit the Trust's posture as an employer, or as an entity which does not contribute new outside funds. But even if the requirement could have application to the Trust, we feel it has been clearly satisfied in the existence of the outstanding collective bargaining agreements calling for specific payments to the trustees, in the trustees' knowledge of the payment standard thereby established, and in the trust agreement's designation of the Trust as a potential employer-contributor.

6. We find no significance, either, in the suggestion that if the Trust is permitted to qualify as a contributing employer it will then participate in the selection of employer trustees; that this would mean that the employee trustees have a voice in the selection of their fellow employer trustees; and that this is inimical to the purposes and the requirements of the governing statute. One's posture as a contributor to the Trust (whether as employee or trustee-employer or otherwise) does not necessarily bring with it the right to participate in the selection of employer trustees. The whole contemplation of the statute is that the employers who are entitled to representation in the administration of the fund are those who make their contributions because of their subjectability to collective bargaining with the union as a union. If others not in this category choose to contribute, they take their representation as they find it. Further, to permit the union in any degree to participate in the choice of employer representatives does violence to the statutory standard of equal representation.

We note with interest that the trust in litigation in Sanders v. Birthright, supra, p. 899 of 172 F.Supp., by its very terms, covered "Active full-time employees of the Trustees", and that the legality of this application was not questioned in that case.

*Non-officer employees of the union as beneficiaries.* Here, again, the statute is

3. Section 152(2). "The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include * * * any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

silent and the December 1958 revision of the agreement would permit participation. The district court denied coverage and did so, pp. 309–310 of 225 F.Supp., because to hold otherwise "would be to defeat the primary purpose of" the statute, give union leaders an opportunity to funnel benefits to union employees, and give the union the right to participate in the selection of employer trustees.

■ We hold that the statute does not bar participation of genuine non-officer employees of the union and that this agreement's coverage of the employees is not improper.

■ The same considerations which led to our conclusion with respect to trust employees have equal application and equal persuasiveness here. We mention, in addition, that the union, too, is clearly within the definition of employer as set forth in §§ 501(3) and 101(2), 29 U.S.C. §§ 142(3) and 152(2), and that the Supreme Court has recognized that a union may qualify statutorily as an employer. See Office Employes Intern. Union, Local No. 11 v. NLRB, 353 U.S. 313, 77 S. Ct. 799, 1 L.Ed.2d 846 (1957). We stress again that the union, when it is in the posture of an employer of its own employees, is not an employer of the kind with which it bargains collectively as a union with respect to this trust agreement and, accordingly, is entitled to no voice in the selection of employer trustees. This is a matter of absence of right by the terms of the statute; it is not something which can be affected by contract. Of course, the union is in a dual position, that of employer of its employees, and that of basic union status with respect to the contributing employers. But this dualism of position is not irreconcilable with the statute and the functioning of a § 302(c) (5) trust.

See, again, the agreement in Sanders v. Birthright, supra, p. 899 of 172 F. Supp.

■ We are aware that, in United States Trucking Corp. v. Strong, 239 F. Supp. 937 (S.D.N.Y.1965), the court held that payments by employers to a pension fund, to which the union was a contributor on behalf of its own employees, were not within the exception of § 302(c) (5). As we read that opinion the court arrived at its conclusion because it felt that the union had placed itself in a position of possible conflict of interest. We are not similarly persuaded by that remote possibility. In our view, the issue is whether the exception language of the statute has been met and satisfied and is not whether the union conceivably has placed itself in a position of conflict of interest. The latter does not fall into that category of mischiefs which the legislative history reveals to be the target of the statute.

■ *Officers of the union as beneficiaries.* The statute once more is silent. The agreement since 1958 refers generally to employees of the union but makes no special mention of its officers. From the Trust's inception officers have been included. The district court denied coverage for them, holding, p. 309 of 225 F. Supp., that Office Employes, supra, related to "clerks, secretaries, and the like", and that if officers were considered employees, and organized, one would have a situation where the officers are bargaining with themselves.

We hold that the statute does not bar participation of a union's officers and that this coverage, when agreed to by the trustees and permitted by the governing trust agreement on a basis no better than that afforded others, is not improper.

■ An officer of a union is an employee of that union just as the president of a corporation is its employee. He is no less an employee for the purposes of a jointly administered fund under § 302 (c) (5) because he may also possess managerial capacity and not be in a position to bargain collectively with his own union as his employer. The right collectively to bargain is an entirely different question. Section 302(c) (5) speaks only of "the employees" of an employer. It draws no distinction among employees. We have noted before that the statute

has a relationship with existing Internal Revenue Code provisions and we now note further that these code provisions, § 165(a) (3) (B) and (4) of the 1939 Code and § 401(a) (3) (B) and (4) of the 1954 Code, permit the inclusion of officers and supervisors if there is no discrimination in their favor.

The considerations which we have found persuasive with respect to trust employees and non-officer union employees have application here. Again, we see no danger of special opportunity for abuse and we deem it natural, and not unexpected, that union officers be able to qualify for benefits no more favorable than those available to other beneficiaries.

*The Jefferson County land and recreational activity.* Blassie and Etzel appeal with respect to this issue but Poole and Davis do not join them.

■ The district court noted, pp. 310–311 of 225 F.Supp., the expenditure of a substantial amount of trust funds in the purchase and development of this land acquired from a corporation owned and controlled by Blassie and Etzel; its limited seasonal use; its being made available to persons and groups having no connection with the union or the Trust; and its planning and domination by Blassie. The court found, p. 310, that "the area was acquired for recreational purposes and it has never been used in any respect for any other purpose". The evidence adequately supports this finding of fact and it is not our privilege to disturb it.

■ This takes us to the statute. If the acquisition and maintenance of a facility solely for recreation is within the intendment of § 302(c), it must be so because of the protection of either § 302 (c) (5) (A) and the reference there to "medical or hospital care", or, perhaps, the protection of § 302(c) (6) and the reference there to "pooled vacation, holiday, severance or similar benefits".

We, as was the district court, are not yet ready to construe the term "medical or hospital care" to include "any type of recreational facility or program instituted wholly for recreational purposes". Recreation is not one of the carefully listed exceptions to the statute's prohibition of an employer's payments. While the old adage about all work and no play may make sense, and while some recreation may be desirable for the development of a more fit and complete person, this is not the text of the statute which confronts us. The circumstances under which the statute came into existence, see United States v. Ryan, supra, pp. 304–305 of 350 U.S., 76 S.Ct. 400, Arroyo v. United States, supra, pp. 424–426 of 359 U.S., 79 S.Ct. 864, Arroyo's emphasis, p. 426, 79 S.Ct. 864, upon Congress' concern "with specificity" of benefits and its having established "specific standards"; the origin of § 302 in an amendment to the Case bill, H.R. 4908, 79th Cong., 2d Sess., 92 Cong.Rec. 4809, 5521–22, see Arroyo v. United States, supra, footnote 6 on p. 425 of 359 U.S., 79 S.Ct. 864, a presidential veto of which was sustained; that amendment's second draft's reference to "health, welfare, or other benefits", 92 Cong.Rec. 5041; the later elimination of the words, "or other benefits", in the bill as passed, 92 Cong.Rec. 5499; the detailed listing of the exceptions; and the fact that Congress might have specified recreation had it been an intended purpose, are all factors which convince us (despite the use of general terms in the debates) that "medical or hospital care" does not reach out to include pure recreation and purely recreational facilities.

We reach a like conclusion as to the language of § 302(c) (6). This, adopted in 1959, carefully spells out, as an amendment to such a statute should, a then desired broadening of the stated exceptions. This was to remove doubts theretofore existing as to apprenticeship and training programs and as to vacation, holiday, severance or similar benefits. H.Rep.No. 741, 2 U.S.Code Cong. & Ad.News, 86th Cong., 1st Sess., 1959, pp. 2424, 2445–2456 and 2469–2470. If one is to relate "or similar benefits" solely to the statute's preceding word "severance", this,

of course, lends no assistance to Blassie and Etzel. If one is to relate the phrase also to "pooled vacation" and "holiday", we are still not persuaded. We are faced here with a carefully drawn and restricted statute and we believe it right and proper to leave any expansion to pure recreation to the Congress rather than to presume to accomplish that end by a judicial determination which rests on a dubious foundation.

This conclusion really makes it unnecessary for us to determine the secondary question whether, if statutory authority exists, this particular trust agreement allows expenditures for pure recreation. In any event, we doubt if such was within the intendment of the parties to the agreement, for the 1959 amendment to the statute was subsequent to the last complete revision of the agreement. The language of Article IV, Sec. 2(i), although broad in its reference to "camp", seems to us to be dependent upon a "health and medical center" in connection with it and was not expected to stand on a purely recreational footing.

It may well be that circumstances will arise sometime, or even are present today, where a particular facility with recreational attributes nevertheless has, in the light of developing medical knowledge and advice, a direct relationship to medical care and would be permissible under the statute. This would have to be determined for each case. We agree with the district court here that the over-ambitious, expensive, wholly recreational program revealed by this record for the Jefferson County land, despite its claimed justification as a part of an alleged plan for the far future, is not that case.

The Teamsters amicus expresses deep concern that the district court's reported opinion is more sweeping in its condemnation of recreation as a trust purpose than is the language of its unreported decree directed only to "any type of recreational facility or program instituted wholly for recreational purposes". We may be understood, in our affirmance of the district court on this point, as reading that court's opinion in line with the decree it entered.

 *The pharmacy and its availability to outsiders.* Only Blassie and Etzel appeal as to this. The Trust's Saint Louis building which houses its Medical Institute contains space for a pharmacy. The Trust leased this space and fixtures to two brothers. The lessees operate the pharmacy but are obligated to make drugs available to trust beneficiaries on a cost plus basis. This effect a substantial savings for the customer. The favorable patronage, however, has not been restricted to beneficiaries of the Trust. Instead, it has been made available to members of three other unions and perhaps other persons not connected with the Trust.

The district court held that the Trust is one solely for the benefit of the trust beneficiaries and that the pharmacy's availability to outsiders violates the statute.

Blassie and Etzel argue that the Trust does not operate the pharmacy; that trust funds are not used to buy and sell drugs; that the Trust merely arranged that the lessees would sell to trust beneficiaries at reduced prices; that the Trust has no authority to limit the lessees' class of customers; and that sales to outsiders create volume which probably makes it possible to sell drugs favorably to beneficiaries.

We agree with the reasoning of the district court. The Trust and its assets are solely for the benefit of its beneficiaries. We see nothing violative of § 302(c) or of the trust agreement in the trustees' insistence that the lessees furnish drugs to trust beneficiaries at a reduced price. At the same time, we see nothing legal in a direction by the trustees, through contract or otherwise, that this favorable arrangement be extended and made available for non-beneficiaries, such as union members who are not covered employees, members of other unions, or an outsider of any kind. The pharmacy is not a facility for the union man as such. It is one for the trust benefici-

ary. The evidence does not reveal the pharmacy lease as an investment asset of the Trust. Instead, it shows it to be a service facility in a service building, complementing the medical and surgical care available there and actually comprising a part of that care. Any suggestion that it is not for a landlord to dictate the details of a lessee's business operations cannot be applicable here. The pharmacy facility is no more available to an outsider than the Medical Institute itself is or should be.

We realize that there will be difficulties in enforcement here and that there are easy ways for a beneficiary or a pharmacist, or others, to get around the restriction. Nevertheless, the principle exists. This is a trust, with all the implications which that term possesses. The trustees may not, directly or indirectly or through the lessees, by contract, rebate, insufficient rent, dictation, pressure, or in any other manner, afford benefits to outsiders which belong exclusively to the beneficiaries.

*The location of the trust offices.* The administrative office for the trust's insurance program has been located for some years in a Saint Louis building owned by the union's Benevolent Society. The same building contains offices of the Society, of the union itself, of the union's credit union, of the union's insurance agency, and of another union. The district court ordered relocation removed from any union activities. Blassie and Etzel appeal as to this and they are joined in protest by the eastern amici.

Here, again, the Act and the trust agreement are silent. Nevertheless, we do not disturb the district court's decree as to this issue.

We are not to be understood as holding that the statute or any legal principle inflexibly prohibits the location of the office of a § 302(c) trust in a building owned by the union or by one of its agencies or, for that matter, by a contributing employer. See Ware v. Adams, 53 LRRM 2290 (S.D.Cal.1963). There might be an element of convenience for the trust beneficiaries in such a location or an element of financial savings to the trust. There is, however, no obligation for the trust so to locate, with consequent benefit to a landlord who is also an interested party. We incline to the belief that it is better judgment for trustees to locate trust offices in quarters which have no connection with any of the parties to the trust agreement. This is more in keeping with the fiduciary personality of the trust and its presumed independent character. While the choice of location may well be, ordinarily, a matter for the discretion of the trustees and not one to be determined anew by a court, the gist of the district court's holding here is that this discretion was abused, that this abuse was a violation of the Act, and that its perpetuation may be enjoined under § 302(e). We cannot say that, on this record, this was error. Precedent is afforded by American Bakeries Co. v. Barrick, 162 F.Supp. 882 (N.D.Ohio, 1958), aff'd 285 F.2d 426 (6 Cir. 1960).

In summary, therefore, we find ourselves in general accord with those portions of the district court's judgment and decree relating to the Jefferson County land, to the non-use of trust assets for a recreational facility or program instituted wholly for recreational purposes, and to the removal of the trust office (Paragraphs II, III, and V), to retired persons who have never been the subject of coverage by contributing employers (part of Paragraph I(a)), and to the pharmacy (Paragraph IV) when its availability is extended to the broadened class of beneficiaries contemplated by this opinion. We are in disagreement with the district court as to those portions of its judgment and decree which deny trust benefits to retirees who were covered prior to retirement, to employees and officers of the union, and to employees of the Trust (Paragraph I(a), (b) and (c)).

We observe, perhaps gratuitously, that we attempt by this opinion to lay down general guidelines for trusts of this kind. This, of course gives no assurance that the functioning of any particular trust will be free of difficulty. We suspect

fewer problems will arise if this Trust, in contrast to its past, is administered by its trustees in an atmosphere of true joint administration and free from individual domination and manipulation. This is the intendment of the Congress and of the statute which it produced. There is really no reason why the Trust cannot be made to function in a business-like, impartial and fair manner and in full compliance with the provisions of the trust agreement. Thereby it will fulfill the purposes for which it was created.

The district court's judgment and decree is vacated and the case is remanded for the entry of a new judgment and decree in conformance with the views herein expressed.