TRUSTEES OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 531 SICK AND WELFARE FUND, and Roy W. Harris, as President of the International Brotherhood of Teamsters Local Union No. 531, Plaintiffs,

v.

MARANGI BROS., INC., Donato Marangi, Inc., Marangi Disposal, and Cottage Carting, Inc., Defendants.

No. 02 Civ. 4384(CM)(MDF).

United States District Court, S.D. New York.

Oct. 30, 2003.

Barry I. Levy, Elan Raviv Kandel, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox, LLP, New York City, for Plaintiffs.

David W. Silverman, Granik, Silverman, Campbell & Hekker, New City, NY, for Defendants.

**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MCMAHON, District Judge.

Plaintiffs, Trustees of the Local 531 Sick and Welfare Fund and Roy W. Harris, as President of the International Brotherhood of Teamsters Local Union No. 531, bring this action pursuant to Employee Retirement Income Security Act ("ERISA") sections §§ 502 and 515 (29 U.S.C. §§ 1132, 1145) and LMRA § 301 (29 U.S.C. § 185) for recovery of delinquent employer contributions to the Sick and Welfare Fund and unpaid dues. Plaintiffs allege that defendant Donato Marangi, Inc. ("Marangi") has violated its Collective Bargaining Agreement by under-reporting the number of employees for purposes of paying dues and failing to make required contributions to the Local 531 Sick and Welfare Fund ("Fund") for those employees and that Marangi Disposal has failed to make payments pursuant to its agreement with Local 531 ("Union"). The defendants, Marangi Brothers, Inc, Donato Marangi, Inc. Marangi Disposal and Cottage Carting, move for summary judgment on the Trustees' claims for delinquent contribution to the Local 531 Sick and Welfare Fund ("Fund") on the grounds that any payments to the Fund would violate LMRA § 302 (29 U.S.C. § 186). For the reasons stated below, the defendants' motion for summary judgment as to the Trustees is granted in part and denied in part.

## FACTS

The Fund is a jointly administered, multi-employer, trust fund established pursuant to collective bargaining agreements between the Union and employers in accordance with § 302 of the Labor Management Relations Act of 1947 ("LMRA") (29 U.S.C. § 186). The Fund is an employee benefit plan within the meaning of sections 3(2), 3(3), and 502(d)(1) of ERISA (29 U.S.C. §§ 1002), and is a multi-employer plan within the meaning of sections 3(37) and 515 (29 U.S.C. §§ 1002(2), (3) and 1145). The purpose of the Fund is to provide health and welfare benefits to eligible employees on behalf of those employers who have chosen to participate in the fund by agreement with the Union.

Defendants Donato Marangi, Inc., Cottage Carting, Inc. and Marangi Disposal, a division of Cottage Carting, are for-profit corporate entities doing business within New York State. The companies employ workers, but it is disputed whether the businesses are affiliated—sharing common ownership, management and employees.

It is undisputed that defendant Donato Marangi, Inc. ("Marangi") entered into a Collective Bargaining Agreement ("CBA") with Local 531 on or about June 1, 1997. Pursuant to Article 11 of the CBA, Marangi agreed to make payments to the Sick and Welfare Fund, Local 531 for all employees not covered under any other medical plan. Specifically, Marangi agreed to pay $150 per month for people selecting an individual plan and $250 per month for people selecting the family plan. The CBA provides that "[t]he monies so contributed would be used for the purpose of obtaining benefits that the Trustees deem necessary for such employees, employees of the Union and the employees of all Fringe Benefit Funds in accordance with the Trust Agreement covering such plan." Section (f) further required Marangi to forward to the Fund the names of the employees covered along with its monthly remittance. Additional sections describe the process for making contributions when an employee is absent for an extended period and outline procedures in the case of employer default.

Article 36 of the CBA provided that the agreement would remain in full force and effect from June 1, 1997 to May 31, 2000 and would automatically renew from year to year thereafter unless either party provided notice that it wished to terminate or modify the agreement. Between September 1997 and May 2000, Marangi made regular payments on behalf of the employees identified on its dues remittance sheets. On March 21, 2000 the President of the Union, John Zirpoli, sent Marangi a letter which expressly asked that the Agreement be terminated on its expiration date, May 31, 2000. (Silverman Aff. Ex. B). The Union indicated that it would like to renegotiate the Agreement, but there is no evidence that any revised agreement was drafted. Marangi did not specifically acknowledge this termination in writing, and continued to make regular contributions to the Fund until July 2002. (Aff. Serena Troche, Ex. A).

Defendant Marangi Disposal also entered into a Memorandum of Agreement ("Marangi Disposal Agreement") dated June 8, 1999 with the Union whereby it agreed to make certain contributions to the "Welfare Fund" and agreed to certain policies governing vacation days and wages. By its terms, the Marangi Disposal Agreement was to run from June 1, 1999—June 1, 2002. Although the Memorandum Agreement states "[w]hereas, the terms and conditions of the Collective Bargaining Agreement entered into between the Union and the Employer remain unchanged except for the following terms and conditions," it is undisputed that no other written agreements were created between the Union and Marangi Disposal. Marangi Disposal made one payment to the Fund in August 1999, but made no further contributions.

In February 2001, the Trustees directed their auditors to conduct an audit of both Marangi's and Marangi Disposal's books and records for the period June 1, 1997 through December 31, 1999. (Prezioso Aff. ¶ 4, 6). The company acceded to the request and the audit was performed. The audit reports determined that both Marangi and Marangi disposal were delinquent in contributions for the periods between June 1997 and December 1999 and June 1999 through December 1999.

The present complaint alleges that Marangi is liable for contributions in the amount of $38,850 to the Fund between June 1997 through December 1999 any additional contributions determined to be due pursuant to an audit of Marangi's books for the period January 2000 through the date of judgment and any applicable statutory damages and interest.[1] Plaintiffs also seeks to recover for non-payment of dues and initiation fees as well as auditors and attorneys fees. Defendants' pending motion only seeks to dismiss the Trustees' claims on behalf of the Sick and Welfare Fund and the other aspects of the complaint are not under consideration.

## DISCUSSION

*Standard for Summary Judgment*

Under Fed.R.Civ.P. 56(c), a party is entitled to summary judgment if the moving party establishes that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. "[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.

---

1. The figures listed in the complaint are those alleged to be due from both Marangi and Marangi Disposal, and the distribution of those damages has not been alleged.

2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). The court will "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ... and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.' " *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (*internal citations and quotations omitted*).

Defendants argue they cannot be held liable to the Fund for contributions between January 1999 and May 2000[2] because contributions would violate § 302. They also assert that any recovery of damages by the Fund from this suit would also violate § 302.

For the reasons set forth below, I find that defendants can in fact be held liable for failing to make contributions and the Funds recovery of any damages in this action is permissible under § 302. However, that portion of defendants' motion which seeks to limit damages after May 31, 2000 is granted.

*Contributions to the Fund Do Not Violate § 302 of the Labor Management Relations Act*

Section 302 makes it unlawful as a general matter for employers to provide payments to union affiliated representatives and entities beyond certain narrowly tailored exceptions outlined in subsection (c). 29 U.S.C. §§ 186(a), 186(c). The relevant exception for purposes of determining the legality of payments to an employee Trust Fund is § 302(c)(5). Under § 302(c)(5) an employer may make payments to a Union affiliated trust fund provided that the fund was established:

for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees ... jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* that (A) such payments are held in trust for the purpose of paying ... for the benefit of employees ... for medical or hospital care ... unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and ... employees may agree upon.

The Collective Bargaining Agreement entered into between the Union and Marangi clearly meets these criteria. The CBA constitutes a written agreement within the meaning of § 302(c)(5). The Fund was established "[i]n order to protect and promote the health and welfare of employees" and sets forth the detailed basis on which payments shall be made e.g., $150 per month per employee and that in the event of employees prolonged absence the employer shall continue to contribute for a period not to exceed two months. (CBA, Art. 11 §§ a, e). Moreover, the agreement states that the monies so contributed shall be used for the purpose of "obtaining benefits that the Trustees deem necessary for such employees, employees of the Union and the employees of all Fringe Benefit Funds in accordance with the Trust Agreement covering such Fund." (*Id.* at § d). Finally, the Trust Agreement establishing the Fund (Ex. D–DM–B) specifically pro-

---

**2.** Although the CBA was effective as of June 1, 1997, Marangi's obligation to contribute to the Fund did not become effective until January 1999.

vides that "Welfare benefits and standards of eligibility and qualifications therefore shall be determined by the Union and may be changed or amended by the Union in its discretion, but shall nevertheless by [sic] *jointly administered* under the Welfare Committee pursuant to the instrument." (Article V § 7) (emphasis added). The Trust Agreement further provides that decisions of the Welfare Committee "shall be by a majority vote of at least two (2) Trustees (the voting body to consist of at least (1) Company-appointed Trustee and one (1) Union-appointed Trustee)," and ensures joint administration pursuant to § 302's requirements. (Art. 1 § 4(b) as amended.)

■ Defendants argue that making contributions to the Fund would violate § 302 because the Fund pays benefits to employees of the Union as well as employees covered under collective bargaining agreements negotiated with employers. This assertion is not persuasive. The law is clear, and the parties agree, that a Union, as an employer, can contribute to a Union-sponsored Fund for the purposes of providing benefits to its employees. *United ed States Trucking Corp. v. Strong,* 359 F.2d 392, 393 (2d Cir.1966). Defendants do not challenge this, but hypothesize—based on the Union's failure to provide a written agreement—that the Union is not in fact contributing to the Fund as an employer. Defendants contend that, because the Union has not produced a written agreement between itself as an employer and the Fund, any money Marangi were to contribute would be in violation of § 302. (D. Reply Mem. at 4).

The Union has not in fact produced a written agreement between itself as employer and the Fund. Nor does the Union allege that such a written agreement exists. The Union avers that a written agreement is not required under the stat- ute and that it has properly made contributions on behalf of its employees at the same rate as the highest participating employer in accordance with annual auditors' assessments. (Pl. Letter Mem. dated October .15, 2003; Prezioso Aff. ¶ 3; Harris Aff. ¶ 4). The Union relies on several cases which I find persuasive in support of its contention that § 302 does not require the Union, as employer, to have a written agreement regarding payments to the Fund.

In *Blassie v. Kroger, Co.,* 345 F.2d 58, 72 (8th Cir.1965), Judge Blackmun—later Justice Blackmun—held that § 302(c)(5)(B) did not bar either a Union from contributing on behalf of its employees, including Union officers, or the Trust from contributing on behalf of its employees. In light of the fact that the statute was aimed at " 'practices which Congress considered inimical to the collective bargaining process,' " the court held that the written agreement requirement in § 302(c)(5)(B) was "obviously directed only to the collective bargaining employer's payments and not to such supplemental ones," as those payments from a Union or Trust. *Id.* at 67, *quoting Arroyo v. United States,* 359 U.S. 419, 425–426, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959). Because the statute itself was silent regarding contributions from a Trust or Union as employer and the Trust agreement allowed such payments, the Court held those payments were proper under § 302. *Id.* at 71–74. In *Strong,* the Second Circuit adopted the Eighth Circuit's reasoning in *Blassie* and likewise held that a Union could contribute to a Trust Fund on behalf of its employees. *Strong,* 359 F.2d at 393 ("We agree with the reasoning of the cases decided in the Eight Circuit ..."); *See also, New York State Teamsters Conference Pension and Retirement Fund v. Hoh,* 554 F.Supp. 519, 527–28 (N.D.N.Y.1982) (acknowledging ap-

plication of written agreement requirement as limited to employers subject to the collective bargaining process.)[3] As Judge Blackmun reasoned, there appears to be no danger to the collective bargaining process by allowing the Union to contribute to the Fund in this case, and in so far as the Trust Agreement itself does not limit the Union's ability to do so there is no reason to find that the Union must have a written agreement—with itself—that details the basis upon which payments will be made. Therefore, contributions from Marangi do not fall within the prohibition of § 302.

■ Defendants further argue that its payments would be improper because under the Trust Agreement welfare benefits and standards of eligibility are to be determined by the Union. (Trust Agreement Art. V § 7). The defendants correctly state that "the determination of benefits and matters of trust fund administration to be made solely by a union is violative of the provisions of § 302(c)(5)," but fail to recognize that the very same section they cite specifically requires that the Fund "shall nonetheless by [sic] jointly administered under the Welfare Committee pursuant to the instrument." (Def. Supp. Mem. at 2). Moreover, other provisions in the Trust Agreement and CBA indicate that it is in fact the Trustees who make the benefit determinations. (Trust Agreement Art. 1 § 2a; see also CBA Art. 11 § b) ("The monies so contributed shall be used for the purpose of obtaining benefits that the Trustees deem necessary."). The Fund is therefore in compliance with the joint administration requirement of § 302(c)(5)(B).

Defendants' suggestion that the CBA is in some way deficient because it does not contain the "typical phraseology of a collective bargaining agreement in that the signature to the agreement constitutes acceptance of and acquiescence to abide by the terms of the plan and trust agreement of the multi-employer trust . . ." is likewise unpersuasive. (Def. Mem. at 4). Defendants point to no case suggesting that this language is required, nor does the statute require it. Beyond the need for a detailed description regarding the basis on which an employer's contributions will be made, neither the statute nor relevant case law specify the type of written agreement or the content of the written agreement. 29 U.S.C. § 186(c)(5)(b); *Moglia v. Geoghegan*, 403 F.2d 110, 115 (2d Cir.1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969) (The written agreement with the employer may be a "written collective bargaining agreement or any other written agreement."). The absence of this language does not invalidate the CBA.

■ For similar reasons, defendants' argument that Marangi Disposal never had a proper collective bargaining agreement and therefore cannot make contributions to the Fund must also be rejected. The statute only requires that the basis upon which the employer shall contribute to the fund be memorialized by a written agreement. However, it does not limit parties to any rigid form or type of contract. In *Doyle v. Shortman*, 311 F.Supp. 187, 195 (S.D.N.Y.1970), the court specifically rejected the defendants' contention that the written agreement required by

---

**3.** In *Strong,* there was no discussion of the written agreement issue because the district court did not consider the issue and held the Union could not contribute to a welfare Fund established through its collective bargaining with employer because it might create the very conflict of interest in the collective bargaining process which Congress sought to avoid when it enacted § 302. *US Trucking Corp. v. Strong,* 239 F.Supp. 937, 941 (S.D.N.Y.1965).

Section 302(c)(5)(B) must be a collective bargaining agreement. In *Moglia,* the Second Circuit expressly recognized that the written agreement with the employer may be any kind of written agreement. *Moglia,* 403 F.2d at 115; *see also, Brown v. Volante Corp.,* 194 F.3d 351 (2d Cir. 1999) (Section 302(c)(5)(B) does not require that an agreement be signed, only that it be "written" and set forth "a detailed basis on which ... payments are to be made."); *Masters, Mates and Pilots Pension Plan v. Lowen,* 161 F.3d 2, 1998 WL 614136 (4th Cir.1998) (Listing different types of documents which have been held to satisfy section 302 including remittance reports and payroll sheets); *Gariup v. Birchler Ceiling & Interior Co., Inc.,* 777 F.2d 370, 375 (7th Cir.1985) ("a signed, unexpired collective bargaining agreement between the parties is not required to satisfy section 302(c)(5)(B); rather section 302(c)(5)(B) requires only a 'written agreement,' not a written collective bargaining agreement.") The Agreement between the Union and Marangi Disposal lays out the required monthly payments per employee, and was signed by the parties. It thus satisfies the written agreement requirement of § 302(c)(5)(B).

*Payments of Any Judgment Will Not Violate § 302*

■ Defendants also seek to avoid the impact of an unfavorable judgment by arguing that an award of any judgment would not be to the benefit of the employer's employees, as required by § 302(c)(5). Section 302(c)(5) provides an exception to the usual rule that it is unlawful for an employer to pay any money to any representative of any of his employees who are employed in an industry affecting commerce or to any labor organization or its employees which represents any of his employees who are employed in an industry affecting commerce. (LMRA § 302(a)).

Defendants' focus on the requirements of the § 302(c)(5) exception here is misplaced. If defendants are found to have breached the CBA, plaintiffs would be entitled to an award of damages because Section 302(c)(2) specifically excludes the application of § 302(a) to any payments made to an employee representative which are made "in satisfaction of a judgment of any court." § 302(c)(2). *cf. New York Telephone Co. v. Communications Workers of America Local 1100, AFL–CIO,* No. 99 Civ. 909, 2000 WL 1174944 at *4 (S.D.N.Y. Aug. 18, 2000) (were an arbitrator to determine that an employer violated a collective bargaining agreement § 302(c)(2) would govern not § 302(c)(5)); *Washington Post v. Washington–Baltimore Newspaper Guild, Local 35,* 787 F.2d 604, 607 (D.C.Cir.1986) (arbitrator's award against employer for violating CBA did not violate § 302 because it fell within the § 302(c)(2) exception).

■ Citing a Third Circuit opinion, *Agathos v. Starlite Motel,* 977 F.2d 1500 (3rd Cir.1992), defendants nevertheless argue that the § 302(a) rule applies because the time has passed within which its employees could properly make claims against the Fund. Defendants argue that this fact means that any payments it makes will not benefit their employees—ergo, defendants cannot be held liable for delinquent contributions on behalf of unreported employees.

■ Although this Court is not bound by Third Circuit precedent, it is worth noting that the present case is distinguishable from *Agathos.* In *Agathos,* the Third Circuit held that a Fund's failure to provide information to employees and perform its "watch dog duties" pursuant to ERISA "mitigated" against "unconditionally requiring" the defendant to make payments. *Id.* at 1507. The Court reasoned that be-

cause the Fund had not notified employees about their rights, those employees had no basis on which to expect that contributions were made or that they were entitled to benefits. Therefore, the Court held it was unlikely the employees had or would assert a claim to the Fund, and therefore an award of delinquent contributions would constitute a windfall to plaintiffs who had actually provided no services. *Id.* There does not appear to be any similar mitigating conduct on behalf of the Fund in this case, and the "general rule [that] an employer is liable for fund contributions on behalf of all employees covered by a facially valid collective bargaining agreement regardless of whether the employees actually collect benefits" applies here. *Id.* at 1506.

There is no requirement that proof of employee claims be made in an action for delinquent contributions. Such a requirement would be contrary both to Congressional intent as evinced in ERISA § 515 and public policy. Section 515 provides in relevant part:

> Every employer who is obligated to make contributions to a multi-employer plan under the terms of ... a collective bargaining agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of ... such agreement.

"Congress added Section 515 to ERISA to 'permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law.'" *Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310, 314 (2d Cir.1990) cert. denied, *Brower's Moving & Storage, Inc. v. Benson,* 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990) (internal citations omitted).

This Circuit has interpreted § 515 as limiting the defenses available to employers when sued by an employee benefit plan to those cases in which the agreement is void for fraud or in which payments would be illegal. *Id. See also, DeVito v. Hempstead China Shop, Inc.,* 38 F.3d 651, 653–654 (2nd Cir.1994) (Dispute regarding the validity of agreement itself, by virtue of contract ambiguity, properly considered in § 515 claim); *Trustees of Bricklayers and Allied Craftworkers, Local 5 New York Retirement, Welfare, Apprenticeship Training and Journeyman Upgrading and Labor–Management Coalition Funds v. Charles T. Driscoll Masonry Restoration Co., Inc.,* 165 F.Supp.2d 502, 509–510 (S.D.N.Y.2001) (citing *Benson* and *Hempstead* ). Defendants have not alleged any fraud on the part of the plaintiffs or the existence of any ambiguity suggesting the contract cannot be enforced. The defense of unjust enrichment (which is what defendants rely on here) does not fall within these limited categories. Therefore, I find that plaintiffs would be entitled to an award if defendants are found to have breached the CBA.

*Limitation of Damages (Marangi Only)*

That portion of Defendants' motion seeking to dismiss the claims for damages arising under the Marangi Agreement after May 31, 2000 is granted. The CBA, which outlined the basis for Marangi's contributions to the Fund, expired on May 31, 2000, after the Union expressly asked, in its March 21, 2000 letter to Marangi, that the agreement be terminated. (D.Ex. B). Although the Union also asked that a new CBA be negotiated, there is no evidence that any new agreement was drawn up. Absent a written agreement detailing the basis on which payments are to be made, any employer contributions to a Fund are illegal under § 302 and plain-

tiff cannot now seek to recover contributions for that period under the statute.[4]

Plaintiffs rely on *Brown v. Volante Corp.*, 194 F.3d 351 (2d Cir.1999) in support of their contention that the defendants' course of conduct evinced defendants' intention to be bound by a collective bargaining agreement beyond the initial contract period. Plaintiffs' reliance on *Brown* is misplaced. In *Brown*, the Second Circuit held that the defendant's course of conduct—including, *inter alia*, continued monthly remittances for 61 months and consent to an audit—manifested her intent to be bound by two draft CBAs (which were never signed) that were created after the termination of the original (signed) CBA. *Id.* at 355. In *Brown*, the unsigned CBA was held to meet § 302's written agreement requirement, and the course of conduct was the basis on which the court concluded that the employer had agreed to abide by the terms of the unsigned writing despite its failure to sign the draft agreements. *Id.*

In this case, no subsequent agreement was drafted after the expiration of the CBA, so the plaintiffs' arguments that the CBA remained in effect are unavailing.

Article 36 provides that the Agreement shall

> continue in full force and effect [until] May 31, 2000 and shall be automatically renewed from year to year thereafter unless at least sixty (60) days prior to any expiration date either party desiring to terminate or modify this Agreement shall so notify the other party in writing. During any period of renewal, the increase set forth for the first (1st) year thereof shall be granted as of such renewal date.

In its March 2000 letter the Union indicated its desire to terminate the existing CBA and begin renegotiation of the agreement, and the CBA, therefore, expired on May 31, 2000. Because the Union itself indicated an intent not to be bound by the expired CBA's terms (by requesting that it be terminated), Marangi's continued payments—even accompanied by Marangi's note to the Union (sent in response to the Union's May 14, 2002) stating "Last bill received was 2/02. Just received your 5/02 bill! Checks enclosed for 3 months"—do not manifest any sort of agreement on the terms of a writing. The payments thus cannot be relied on to satisfy the written agreement requirement.

This Court's opinion in *Hanley v. Herrill Bowling Corp.*, No. 94 Civ. 4611, 1995 WL 428966 (S.D.N.Y. July 20, 1995) supports this decision. In *Herrill*, Judge Patterson considered a similar case and held that the Union could not seek contributions post-expiration for an unreported employee, even though the employer had continued to make contributions for other employees for one year after the agreement was terminated. As in this case, the CBA provided that the agreement would automatically renew unless either party gave notice of its intent to modify or terminate. *Id.* at *1. Just prior to the expiration of the Agreement, the Union notified Herrill that it intended to modify the Agreement. In response, the employers announced their intention to terminate the Agreement. The Funds thereafter acknowledged termination of the Agreement. *Id.* Despite these events, the employer continued to make contributions to the Fund on behalf of some of its employees, but failed to contribute for certain other employees. The court held that in the

---

4. This ruling concerns defendant Marangi only. Marangi Disposal's written agreement ran through 2002 and while it referenced the

CBA, the expiration of the CBA did not result in the expiration of the separate Marangi Disposal agreement.

absence of an existing agreement requiring the contributions to be made, the plaintiffs could not recover under either ERISA or the LMRA. *Id.* at *4. *See also, Brown v. Dominic Prisco Transport, Inc.,* No. 95 Civ. 1121, 1997 WL 1093463 (E.D.N.Y. Aug.16, 1997) (Employer's course of conduct, including periodic contributions to Fund after expiration of CBA, did not constitute "reaffirmation" of agreement creating implied contract on same terms as original CBA.)

■ In the absence of a new draft CBA or a clause in the CBA requiring continued payments during contract renegotiation, defendants cannot be held liable for payments after the expiration of the CBA under ERISA § 515. *See Building Service 32B–J Health v. Vanderveer Estates Holding, LLC,* 121 F.Supp.2d 750, 755–756 (S.D.N.Y.2000), reconsidered, 127 F.Supp.2d 490, 495 (S.D.N.Y.2001) (Holding defendant liable for continued contributions because of "evergreen clause" in CBA which specifically required continued payments after the termination of the CBA). Article 36 does not contain a provision requiring continued payments during renegotiation, and, as a result, defendants cannot be held liable under LMRA § 302 or ERISA § 515 for any payments after the expiration of the agreement.[5]

### CONCLUSION

For the foregoing reasons, defendant's motion for partial summary judgment is denied in part and granted in part.

The Clerk of the Court is directed to enter an order denying defendants' motion for summary judgment except with respect to plaintiffs' claims seeking damages for contributions on behalf of defendant Donato Marangi Inc. after May 31, 2000—those claims are dismissed.

---

5. As Judge Patterson noted in *Hanley,* Marangi may also be held liable for post-expiration contributions under NLRA § 8(a)(5); however, as a general rule, the NLRB has exclusive jurisdiction over claims brought under this statute. *Laborers Health and Welfare Fund for Northern California v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 548–553, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988).